IN THE
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA ex rel.<br>ALBERT CHAVEZ, | ) <br> ) <br> ) | |
| Petitioner, | ) <br> ) | |
| v. | ) <br> ) | No. 08 C 50104 |
| DONALD HULICK, Warden,<br>Menard Correctional Center, | ) <br> ) <br> ) | The Honorable<br>Frederick J. Kapala, |
| Respondent. | ) | Judge Presiding. |

### NOTICE OF THIS COURT'S PRIOR INVOLVEMENT
### IN PETITIONER'S STATE CASE AND WAIVER

Pursuant to 28 U.S.C. § 455(a), respondent DONALD HULICK notifies this Court as to the following:

1.   This Court, while a Justice of the Appellate Court of Illinois, sat on the appellate court panel that affirmed petitioner's conviction and sentence on direct appeal. *People v. Chavez*, No. 2-03-0071, slip at 15 (Ill. App. Aug. 13, 2004) (Rule 23 Order) (Byrne, J., with Bowman and Kapala, JJ., concurring) (Exhibit A). Accordingly, this Court should consider whether to recuse itself from presiding over this challenge to that conviction.

2.   In 2002, in the Circuit Court of Ogle County, Illinois, petitioner was convicted of first degree murder and sentenced to 28 years' imprisonment. (Pet. at 1). Petitioner's conviction was affirmed by the Appellate Court of Illinois, Second

District, *People v. Chavez*, No. 2-03-0071, slip at 15 (Ill. App. Aug. 13, 2004) (Rule 23 Order) (Byrne, J., with Bowman and Kapala, JJ., concurring) (Exhibit A), and the Supreme Court of Illinois denied petitioner leave to appeal (PLA). (Pet. at 2). Petitioner filed a postconviction petition that was dismissed by the trial court, and that dismissal was affirmed by the appellate court. (Pet. at 3). The Illinois Supreme Court denied petitioner's PLA, thus ending petitioner's state court proceedings on April 30, 2008. (*Id.*).

3.   On June 16, 2008, petitioner filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging petitioner's state conviction and sentence. (Doc. 1). The case was assigned to this Court. However, this Court was a member of the state appellate court panel that affirmed petitioner's judgment of conviction and sentence. Under such circumstances, recusal should be considered. *Russell v. Lane*, 890 F.2d 947 (7th Cir. 1989).

4.   In *Russell*, the Seventh Circuit considered a similar situation. There, on the day the habeas petition was filed in federal court, Judge Mills of the Central District of Illinois, dismissed four of that petitioner's six claims and ordered the State to answer the other two. *Id.* at 947. Some months later, the judge discovered that he had been a member of the Appellate Court of Illinois panel that had affirmed the conviction that was being challenged in the pending federal habeas petition. *Id.* Judge Mills recused himself, and the case was reassigned to Judge Mihm who subsequently dismissed the remaining claims. *Id.* In discussing the

appropriate remedy for such a situation, the *Russell* court recognized that the disqualification requirement of 28 U.S.C. § 455(a) could be implicated when a federal district court judge heard a habeas petition challenging a state court conviction when that judge was a member of a panel of the state appellate court that had previously affirmed the conviction. *Id.* at 948 ("Russell was entitled to have his habeas corpus petition heard by a judge who had not participated in his conviction.").

4. Respondent files this notice in light of *Russell v. Lane*. Respondent is raising this matter at the outset of the proceedings so that this Court and petitioner are fully informed in order to avoid any unnecessary future litigation and dispute over this point.

5. A conflict of interest that otherwise would require disqualification under 28 U.S.C. § 455(a) may be waived pursuant to 28 U.S.C. § 455(e) if the waiver "is preceded by a full disclosure on the record of the basis for disqualification." 28 U.S.C. § 455(e); *see also Guardian Pipeline, L.L.C. v. 950.80 Acres of Land*, 525 F.3d 554, 557 (7th Cir. 2008) (citing *United States v. Balistrieri*, 779 F.2d 1191, 1204-05 (7th Cir. 1985); *United States v. Murphy*, 768 F.2d 1518, 1540 (7th Cir. 1985)). Furthermore, a party waives a § 455(a) claim if he fails to raise the issue before the district court. *United States v. Ruzzano*, 247 F.3d 688, 694 (7th Cir. 2001). Pursuant to 28 U.S.C. § 455(e), respondent waives any potential objection to this Court presiding over this case under 28 U.S.C. § 455(a).

July 30, 2008                          Respectfully submitted,

                                                                                                                          LISA MADIGAN  
                                                                                                                          Attorney General of Illinois

                                                 By:   /s/ Charles Redfern  
                                                                  CHARLES REDFERN, Bar # 6283811  
                                                                  Assistant Attorney General  
                                                                 100 W. Randolph Street, 12th Floor  
                                                                 Chicago, IL 60601-3218  
                                                                 PHONE: (312) 814-3565  
                                                                 FAX: (312) 814-2253  
                                                                 EMAIL: credfern@atg.state.il.us

## **CERTIFICATE OF SERVICE**

      I certify that on July 30, 2008, I electronically filed respondent's **Notice Of This Court's Prior Involvement In Petitioner's State Case And Waiver** with the Clerk of the United States District Court for the Northern District of Illinois, Western Division, using the CM/ECF system and on the same date mailed a copy of this document in via United States Postal Service to the following non-CM/ECF user:

      Albert Chavez
      R-18500
      Menard Correctional Center
      P.O. Box 711
      Menard, Illinois 62259

      /s/ Charles Redfern
      CHARLES REDFERN, Bar # 6283811
      Assistant Attorney General
      100 W. Randolph Street, 12th Floor
      Chicago, IL 60601-3218
      PHONE: (312) 814-3565
      FAX: (312) 814-2253
      EMAIL: credfern@atg.state.il.us

Case 3:08-cv-50104  Document 12-2  Filed 07/30/2008  Page 1 of 15

This Order Is Not Precedential And Is Not To Be Cited

RECEIVED AUG 16 2004 SHAP SECOND DISTRICT

No. 2--03--0071

FILED AUG 1 3 2004 ROBERT J. MANGAN, CLERK APPELLATE COURT 2nd DISTRICT

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | |
|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) Appeal from the Circuit ) Court of Ogle County. ) |
| Plaintiff-Appellee, | ) No. 01--CF--127 ) |
| v. | ) ) |
| ALBERT CHAVEZ, JR., | ) Honorable ) Stephen C. Pemberton, |
| Defendant-Appellant. | ) Judge, Presiding. |

**RULE 23 ORDER**

After a second jury trial following a mistrial, defendant, Albert Chavez, Jr., was found guilty of first-degree murder (720 ILCS 5/9--1(a)(2)(West 2000)) and sentenced to 28 years' imprisonment. On appeal, defendant contends he was denied a fair and impartial jury because during voir dire the trial court abused its discretion: (1) by failing to excuse a juror for cause which required defendant to exhaust his peremptory challenges so that he was unable to challenge a later juror whom he would have excused with a peremptory challenge; and, (2) by refusing to reopen questioning of the 10 jurors selected from the first panel of veniremen because a prospective alternate juror revealed there had been some discussion of the case among the second panel of veniremen. Defendant also contends that the trial court imposed an excessive sentence. For the following reasons, we affirm.

BACKGROUND

EXHIBIT A

On September 18, 2001, defendant stabbed his live-in boyfriend, Ronald Andrews, with a kitchen knife while he was sleeping in their apartment. Defendant called 911 at approximately 3:18 a.m., identified himself, informed a Rochelle police department dispatcher, Sandra Sullivan, that he had just stabbed his lover, and provided the location of the apartment. When Sullivan asked defendant why he had stabbed his lover, defendant replied that "He was cheating on me." Defendant and Andrews had a long-standing relationship that spanned approximately 12 years. Defendant was arrested and indicted for first-degree murder. Following a mistrial, defendant was tried by a second jury, found guilty, and sentenced to 28 years' imprisonment for first-degree murder.

## VOIR DIRE

Because the case was highly publicized, defense counsel filed a motion for a change of venue due to prejudicial publicity. Counsel submitted various newspaper articles circulated in Ogle County, as well as radio broadcast transcripts. These materials discussed the evidence and opposing theories submitted at the first trial, some of which indicated that the jury had been hung. The trial court decided to wait until voir dire to resolve the matter and, over defense objection, directed that prospective jurors answer a questionnaire concerning their knowledge of and any opinions that they might have regarding the case.

The questionnaire directed each prospective juror to not discuss the questions or answers with anyone else, including other prospective jurors and informed them: "In this case the defendant, Albert Chavez, Jr., is charged with the offense of murder in causing the death of Ronald Andrews." Each juror was asked to check the yes or no response to the following questions: (1) "Before today have you ever heard of Albert Chavez, Jr., or Ronald Andrews?" and (2) "If you have heard or read about Albert Chavez, Jr., or Ronald Andrews or anything about this case, have you formed an opinion of

No. 2--03--0071

Albert Chavez, Jr.'s innocence or guilt as to the charge made in this case?" and, (3) "If you answered yes, what opinion have you formed and on what is it based?" The questionnaire contained an area to write a response to the final inquiry. Each of the prospective jurors filled out the questionnaire before they were questioned.

The jury selection began on September 23, 2002. The parties questioned 45 prospective jurors. Betty Jean Deuth, a potential juror, who had knowledge of the case, was questioned during the selection process for the second panel of four jurors. In response to whether she had formed an opinion of defendant's innocence or guilt as to the charge, she responded: "If he actually stabbed him-- he would be guilty." Because the defense did not contest the fact that defendant had stabbed the victim, but rather challenged the mental state, defendant believed that Deuth's opinion demonstrated she would vote him guilty of murder.

When questioned by the judge, Deuth explained that, "Well, I had just read that he had, you know, stabbed him, and so that was my assumption, yeah, right." The judge asked whether she could put some of her preconceived notions out of her mind, to which she answered: "Truthfully don't know." She agreed, however, that "there can be other issues that might be raised during a trial, even though there was actually a stabbing, that go to the question of whether the Defendant's guilty of murder." Deuth stated that she would be able to decide the case only on the evidence presented in the courtroom, and that she would "certainly try to" follow the law as presented by the court. When the judge asked her whether the evidence that defendant stabbed the victim would, by itself, require a vote of guilty, Deuth stated that, "I would think that I would want to know more than that," and agreed that she would want to know what the issues were from the jury instructions. She further agreed with the judge that she would hear the evidence, and, without making any conclusion about

-3-

No. 2--03--0071

defendant's guilt or innocence, would look at the law, and would decide in her own mind whether she thought the case had been proven. In answering defense counsel's question, Deuth explained that the comment on the questionnaire was just her opinion and reiterated that she would hold the State to its burden as set forth in the instructions. The trial court denied defendant's motion to excuse Deuth for cause, finding that Deuth could be fair. Defense counsel then exercised his last peremptory challenge to excuse Deuth.

Of the 12 jurors selected to try the case, seven had some knowledge of the case. Michelle Grimm, the twelfth juror chosen, was aware of the 11 to 1 vote from the first trial. The defense had perempted two other jurors with knowledge of the vote but had exhausted its peremptory challenges by the time Grimm was questioned. The judge rejected a challenge to strike Grimm for cause on the basis of her knowledge of the case and found that she could be fair.

Eight potential alternate jurors were questioned before two were selected. Gary Perket, the seventh potential alternate juror to be questioned, disclosed that there had been some discussion of the case among some of the prospective jurors after the questionnaires were answered by the second group summoned for service, including the fact that the jury in the first trial had voted 11 to 1 for a guilty verdict. Perket was excused for cause.

The judge then summoned each of the two alternate jurors who had been selected to ask whether either had heard any discussion of the case among the prospective jurors. Alternate juror Jeanine Walter had heard only that the case involved a murder charge. Alternate juror Janice Harbaugh had heard only that defendant was gay, which the juror said would not affect her.

Defense counsel moved to strike the jury, arguing that the prospective jurors had disregarded the instructions on the questionnaire; that no court officer had been supervising the prospective jurors

to ensure that such discussions did not occur; that two jurors from the second summoned group were among the 12 jurors who had ben selected for the trial; and that none of the 12 jurors had been asked about the discussions after the questionnaires were answered.

In response to the motion, the judge recalled for further questioning two of the jurors who had been selected from the second group, jurors Barbara Abernathy Thompson and Grimm. Both denied hearing any discussion of the case among the prospective jurors prior to their selection. The judge thereafter denied the motion to strike the panel, finding that the selected jurors had not discussed the case and could be fair. Counsel renewed the motion for a change of venue, but the trial court denied that motion also. The jury selection was thereby completed and the second trial commenced.

## THE TRIAL

Sergeant Ronald Vandergrift and Officer Jason Bergeron testified that they arrived separately within two minutes of the dispatch. Defendant was standing in the kitchen by the sink, talking on the phone and smoking a cigarette. Vandergrift asked defendant where Andrews was located, and defendant told him that he was in the bedroom. Defendant appeared calm. Vandergrift could smell alcohol on defendant's breath, but he did not believe him to be intoxicated.

Vandergrift found Andrews in the northwest bedroom on the floor at the foot of the bed, lying on top of the bed coverings. He was lying in the fetal position and had heavy, labored breathing. The front of his shirt and the bed coverings were soaked in blood, and there were two large bloody areas on the left side of the bed. Andrews had a chest wound and was unconscious. When Vandergrift returned to the kitchen and asked what happened, defendant responded that Andrews had been cheating on him. Shortly after the paramedics arrived, Andrews stopped breathing.

Sergeant Jose Rangel of the Illinois State Police Crime Scene Services testified that he had observed apparent blood stains on defendant's left chest, upper left leg, and left ankle. Rangel took a swab of the blood from the chest. Forensic scientist James Bald later performed a DNA analysis on the swab and found a profile that matched that of Andrews.

From the apartment, Rangel found a butcher block containing St. Croix brand knives at the end of the counter; one slot in the block was empty. In the kitchen next to the sink was a phone, an ashtray with cigarette butts, a cigarette pack and lighter, and an insulated cup, containing one-inch of a liquid which smelled of liquor. There was no blood on the phone. In the bathroom, Rangel observed a pinkish liquid on the counter top. He took a swab of the liquid, which later showed it contained blood which matched Andrews' DNA profile. Rangel also found a damp pink towel in the doorway of the northwest bedroom. Facing the headboard were two blood pools on the left side of the sheet covering the mattress of the full-size bed, one near the center and the other near the foot. A blood trail followed off the foot of the bed. A comforter and sheet lay bunched together and covered in blood at the foot. When Rangel picked up the sheet and comforter to untangle them, he found a St. Croix knife protruding through a hole in the comforter.

Forensic pathologist Dr. Lawrence Blum testified that Andrews received a stab wound to his left lower chest, which penetrated the cartilage, heart, diaphragm, stomach, and spleen. The wound stopped between the 10th and 11th ribs in the rear but did not penetrate the skin there. The depth of the wound was approximately eight inches and was lethal in character. He attributed Andrews' death to this wound.

Defendant testified that he met Andrews at a bar in the summer of 1990. The two began a romantic, sexual relationship, and Andrews moved into the Rochelle apartment in the summer of

1991. That relationship and living arrangement continued until October 1997, when Andrews moved to Peoria for a job. Defendant intended to join Andrews but found out that Andrews had been unfaithful to him throughout their relationship. Andrews admitted that he had been with 50 other partners. They tried to work things out, but could not, and ended their relationship in February 1998. However, they resumed the relationship and Andrews moved back into the Rochelle apartment in the summer of 1999.

In late August 2001, a friend told defendant that Andrews had been seeing another man who lived in Naperville. When defendant asked him about it, Andrews denied it. Defendant did not believe him, decided to break off the relationship, and asked Andrews to move out. Andrews then admitted to the affair and apologized to defendant. Defendant agreed to continue their relationship if Andrews stopped seeing the other man and attended counseling.

After this, the relationship between the two seemed better. They vacationed in Hawaii. After their return, defendant had to leave town again for work. Upon his return, he asked Andrews what he did while he was away. Andrews' answers made defendant suspicious. After Andrews fell asleep, defendant left the room, mixed himself a drink, and checked the answering machine for messages. One message sounded as if it had been partially erased. Defendant punched "*69" on the telephone to check the last caller. It revealed a number from the Naperville area. He wrote down the number and went to ask Andrews about it. Andrews admitted that the phone number belonged to the man he had been seeing in Naperville and that he had sex with him while defendant was away. Defendant told Andrews to move out of the apartment by the following Sunday.

At Andrews' suggestion, the two returned to bed. However, defendant was unable to fall asleep. Defendant went to the kitchen, drank some more, and smoked a cigarette. He decided that

Andrews should leave immediately. It bothered defendant that Andrews was able to rest after what he had done to defendant, while defendant could not sleep. Defendant picked up a knife and went to the bedroom with the intention of getting Andrews to leave the apartment right away. Defendant intended to stab the knife into the covers so as to awaken and scare Andrews and make him leave. He was not drunk or in a fog at that point.

The lights were off and he could see the covers but not Andrews. Without speaking, defendant went to the side of the bed and punched the knife into the bed. He believed that Andrews was on the left side and that he was reaching over Andrews and was stabbing into the center of the bed. Defendant did not know how much force would be needed to drive a knife into a bed or whether it would be less than needed to stab a person. He did not remove the knife once he punched it down. Defendant realized that he had struck Andrews when Andrews shot up onto his knees. Defendant then backed out of the bedroom. He recalled Andrews moving to the end of the bed and then onto the floor, at which point blood was visible on the bed. At that point, defendant's only thought was to call 911 to get help. He was not certain of the sequence, but acknowledged that he may have rinsed his hands in the bathroom before he used the phone.

After closing arguments, the jury heard the judge's instructions and retired to deliberate. The jury instructions provided the alternative of convicting defendant of the lesser included offense of involuntary manslaughter. The jury found defendant guilty of first-degree murder.

SENTENCING HEARING

Defense counsel requested a minimum sentence of 20 years and urged the court to consider defendant's lack of a criminal record, the unlikelihood of his committing another crime, and the remorsefulness of his actions.

No. 2--03--0071

At the close of the hearing, the judge found that, even though defendant seemed to act in some moment of senselessness, his act was brutal and seemed to be one born out of rage because he "plunged that knife into Ronald Andrews' chest to a depth of eight inches." The judge believed that, based on "the nature of the crime, the anger, rage involved here, even in light of everything else I've said about the momentary, unplanned act, the lack of a criminal background, the good words said on your behalf, requires a sentence in excess of the minimum." Accordingly, after weighing the factors in aggravation and mitigation, the trial court sentenced defendant to a term of 28 years' imprisonment. Defendant timely appeals.

## ANALYSIS

I. Voir Dire

On appeal, defendant first contends that the trial court abused its discretion in handling voir dire, thereby denying him a fair and impartial jury. He cites two instances in which the trial court abused its discretion under this argument. First, he contends that the trial court abused its discretion in failing to excuse Betty Jean Deuth for cause and, because he used his last peremptory challenge to excuse her, defendant contends he was then denied a fair and impartial jury because he was unable to challenge juror Michelle Grimm, whom he would have excused with a peremptory challenge because she had knowledge of the first trial. Second, defendant contends that the trial court abused its discretion by refusing to requestion the 10 jurors from the first panel of veniremen after Gary Perket, a prospective alternate juror, revealed that there had been some discussion of the case among the second panel of veniremen.

As a threshold matter, the State contends defendant has waived the issue of the excusal of the juror for cause for failing to raise it in his posttrial motion. Defendant concedes waiver, but argues

No. 2--03--0071

that this issue should be addressed on plain error grounds. Because this issue affects the constitutional right to a fair trial, we choose to address the merits of the issue. See 134 Ill. 2d R. 615(a); People v. Wilson, 303 Ill. App. 3d 1035, 1041 (1999).

A. Challenge for Cause

We first examine defendant's contention that the trial court abused its discretion in denying his motion to challenge Deuth for cause. The primary responsibility for both initiating and conducting voir dire rests with the trial court, and the manner and scope of that examination lies within the court's sound discretion. 134 Ill. 2d R. 431; People v. Williams, 164 Ill. 2d 1, 16 (1994). The trial judge should consider the venire member's entire voir dire examination and not single out certain statements to determine whether the venire member has the appropriate impartial state of mine. People v. Peeples, 155 Ill. 2d 422, 462 (1993). An abuse of the trial court's discretion will be found "only if, after review of the record, it is determined that the conduct of the court thwarted the selection of an impartial jury." Williams, 164 Ill. 2d at 16. The relevant inquiry in evaluating the court's exercise of its discretion is whether the questions and the procedures employed to gauge juror competency created a reasonable assurance that any prejudice or bias present would be discovered. Wilson, 303 Ill. App. 3d at 1042.

A review of the voir dire examination indicates that initially it appeared as if Deuth was partial and biased toward defendant when she wrote on her questionnaire "If he actually stabbed him -- he would be guilty." However, when questioned further by the judge, her answers revealed that she could be fair and impartial in this case. Deuth agreed that there could be other issues raised during the trial regarding whether defendant was guilty of murder. She also expressed her belief that she would be able to decide the case only on the evidence presented in the courtroom and would try to

follow the law presented by the court. When questioned by defense counsel, Deuth reiterated that she would hold the State to its burden as set forth in the instructions to the jury, and that she would not stop listening to the case after hearing that someone had been stabbed. In denying the motion, the judge stated that he was satisfied that Deuth could be fair. The trial judge is in the best position to observe the potential juror's demeanor and ascertain the meaning of his or her remarks. People v. Buss, 187 Ill. 2d 144, 187 (1999). Here, the trial judge was in a greater position to evaluate Deuth's demeanor. We do not find that the trial court abused its discretion in denying defendant's challenge to excuse Deuth for cause.

Defendant further contends that he suffered prejudice because he was forced to use his last peremptory challenge on Deuth, and thus he exhausted his peremptory challenges before confronting juror Grimm, whom he was forced to accept even though she had knowledge of the case. It is well settled in Illinois that a court's failure to remove a juror for cause is grounds for reversal only if the defense has exercised all of its peremptory challenges and an objectionable juror was allowed to sit on the jury. See, e.g., People v. Pendleton, 279 Ill. App. 3d 669, 675 (1996). In People v. Reinbold, 247 Ill. App. 3d 498, 502 (1993), the court held that reversible error results not from the defendant's exhaustion of peremptory challenges, but from the end result of an unfair jury; the concern is with the jurors who actually sat in judgment of the defendant rather than those excused by peremptory challenges.

Here, defendant alleges that the trial court abused its discretion in failing to excuse Deuth for cause, who was excused by his final peremptory challenge. The proper inquiry on appeal is whether Grimm should have been removed for cause, but defendant fails to present this argument to this court. Furthermore, other than the fact that Grimm was aware that the first trial resulted in an 11 to 1 vote,

No. 2--03--0071

defendant has cited nothing in the record to suggest that Grimm was impartial and therefore, should have been excused for cause. Our state constitution guarantees the right to an impartial jury. The process due under our constitution does not include the right to choose "a jury that is sympathetic to a specific defendant or theory of defense." Pendleton, 279 Ill. App. 3d at 677. Accordingly, we find no prejudice.

B. Insufficient Voir Dire Examination

Defendant next argues that he was denied a fair trial because the trial court abused its discretion by refusing to question the 10 jurors selected from the first panel of veniremen after Gary Perket, a prospective alternate juror, revealed that there had been some discussion of the case among the second panel of veniremen. We disagree.

Perket was excused for cause after he revealed that there had been some discussion of the case among some of the prospective jurors, after the second group summoned for service had answered their questionnaires. The trial judge had started jury selection by calling one panel of potential jurors. When that panel was exhausted, a second group was called. Two members of the second panel had been selected for the jury and the alternates were in the process of being selected when Perket indicated that there had been discussion of the case in the jury room. The judge responded by questioning the alternates and the two members from the second panel who had been selected to serve on the jury. Defendant asserts that the 10 jurors selected from the first panel of veniremen should have been questioned as well. Defendant claims that, absent an inquiry, the judge could not know whether the same sort of discussions that had occurred among the second group, contrary to the admonition on the questionnaire, had occurred among the first group without questioning them again.

No. 2--03--0071

We find no basis for the trial court to question the first panel. The two jurors who were selected to sit on the jury from the second panel of veniremen indicated that they heard little or nothing of the discussion that allegedly took place. One alternate juror mentioned overhearing only limited information, while the other alternate juror denied having heard anything at all. We find no basis for excusing any of these jurors, and defendant does not contend otherwise. Moreover, as pointed out by the State, nothing more than sheer conjecture supports the theory that, if the second panel of veniremen had discussed the case, the first 10 jurors selected to sit from the first panel of veniremen must have done so as well. Accordingly, we do not find the trial court abused its discretion by denying a request to question the first panel of veniremen based on unsupported suspicion.

II. Sentencing

Defendant last contends that his sentence is excessive, asserting that the trial court imposed on overly-long sentence based on his record. We disagree.

It is well established that the trial court is the proper forum to determine a sentence and that the trial court's sentencing decision is entitled to great deference and weight. People v. Latona, 184 Ill. 2d 260, 272 (1998). It is the province of the trial court to balance relevant factors and make a reasoned decision as to the appropriate punishment in each case. Latona, 184 Ill. 2d at 272. A sentence that is within the statutory limits for the offense will not be disturbed absent an abuse of discretion by the trial court. See People v. Coleman, 166 Ill. 2d 247, 258 (1995). A sentence within the statutory limits is excessive and an abuse of discretion if it "is greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense." People v. Stacey, 193 Ill. 2d 203, 210 (2000).

No. 2--03--0071

Relevant factors in determining what sentence to impose include the nature of the crime, the protection of the public, deterrence, and punishment, as well as the defendant's rehabilitative prospects. People v. Kolzow, 301 Ill. App. 3d 1, 8 (1998). The weight to be attributed to each factor in aggravation and mitigation depends upon the particular circumstances of the case (Kolzow, 301 Ill. App. 3d at 8), but, generally speaking, the seriousness of the crime is the most important factor in determining an appropriate sentence (People v. Quintana, 332 Ill. App. 3d 96, 109 (2002)). The trial court is not required to recite and assign a value to each mitigating factor, and the existence of mitigating factors does not obligate the trial court to impose the minimum sentence. People v. Adamcyk, 259 Ill. App. 3d 670, 680 (1994).

Applying these principles, defendant's sentence must be affirmed. As charged here, first-degree murder (720 ILCS 5/9--1(a)(2) (West 2000)) is punishable by 20 to 60 years' imprisonment (730 ILCS 5/5--8--1(a)(1) (West 2000)). Defendant's 28-year sentence is not only within the statutory range, but is closer to the minimum sentence than to the maximum. In arguing that this sentence is excessive, defendant attempts to assert that the offense was the result of circumstances which will not likely recur. However, the testimony at trial shows that, during their long-term relationship, defendant repeatedly returned to his relationship with Andrews and such a dependent and emotionally destructive pattern certainly could recur in another relationship. We also disagree with defendant that, if he were granted the minimum punishment of 20 years, that by the time he would be released from prison at the age of 60, he would not possess the passion and jealousy of a 40 year old. To the contrary, this assumption is not supported by common experience. Although defendant's previous lack of criminal history, steady employment record, strong support from his family and friends, and deep remorse for the consequences of his actions might favor leniency when

viewed in isolation, the seriousness of the offense, and the fact that defendant deliberately plunged a knife eight inches deep into the victim's body while he was sleeping, suggest that his prospects for rehabilitation are poor, that the need to protect the public from his behavior is substantial, and that a longer prison sentence is warranted. In view of all the relevant circumstances, the 28-year sentence was not an abuse of discretion.

## CONCLUSION

Accordingly, the judgment of the circuit court of Ogle County is affirmed.

Affirmed.

BYRNE, with BOWMAN and KAPALA, JJ., concurring.